**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**TROY BOTTEON,** on behalf of himself and all others similarly situated, *

10542 Windlass Run Rd.
Middle River, MD 21220 *

Plaintiff, *

v. * Case No.____________________________

**ANNE ARUNDEL DERMATOLOGY, P.A.**, *

1306 Concourse Drive
Suite #201
Linthicum Heights, MD 21090 *
Anne Arundel County

Defendant. *

# CLASS ACTION COMPLAINT

Plaintiff Troy Botteon ("Plaintiff"), by his undersigned counsel, files this Class Action Complaint on behalf of himself and a class of all similarly situated persons against Defendant Anne Arundel Dermatology, PA. ("AAD" or "Defendant"). Plaintiff bases the forgoing allegations upon personal information and belief, the investigation of counsel, and states the following:

## INTRODUCTION

1. Plaintiff brings this class action complaint on behalf of a class of persons impacted by AAD's failure to safeguard, monitor, maintain, and protect highly sensitive Personally Identifiable Information ("PII") and Protected Health Information ("PHI") (together, "Sensitive Information"). AAD collected, stored, and maintained Plaintiff's and the Class's Sensitive Information as part of its business activities as a healthcare service provider.

2. Anne Arundel Dermatology, P.A. formed over forty years ago in Annapolis, Maryland. Though it began as a solo dermatology practice, it has now become a dermatological goliath with over 60 locations across Florida, Georgia, Maryland, North Carolina, Pennsylvania, Tennessee, and Virginia.[1]

3. As a healthcare provider, AAD collects a variety of Sensitive Information, including patients' date of birth, patient ID, medical record number, health history, financial information, insurance information, and appointment history. In the wrong hands, such sensitive and personally identifying information may be wielded to cause significant harm to the patients whose information was stolen.

4. The U.S. Department of Health and Human Services has instructed that "[i]dentifying information … such as personal names, residential addresses, or phone numbers," although not PHI when listed alone, "would be PHI" and protected by the HIPAA Privacy Rule if it is listed, as here, with "health care provision" data such as service dates and locations.[2]

5. AAD knows that as a healthcare provider, it is "legally required to protect the privacy of [patient] information."[3] AAD failed to do so, and instead utilized inadequate data security measures it knew, or should have known, put the sensitive data it solicited, collected, and stored at significant risk of theft by or exposure to nefarious parties.

6. That risk was borne out between February 14 and May 13, 2025, when cybercriminals exploited AAD's deficient cybersecurity practices and accessed its systems. While in the systems, according to AAD's notice of breach, cybercriminals accessed files containing

---

[1] https://aadermatology.com/about-us/

[2] https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html

[3] https://aadermatology.com/hipaa-privacy-notice/

"certain personal or health information." This information included "date of birth, patient ID, medical record number, health history, financial information, insurance information, and appointment history."

7. AAD did not immediately act to disclose the breach. Indeed, although AAD discovered on May 20, 2025, that cybercriminals had accessed patients' Sensitive Information, it was not until July 11 that AAD informed the Office of Civil Rights that the protected health information of over 1.9 million individuals had been exposed in the attack.[4]

8. The type of information impacted by the Data Breach can be used to orchestrate a host of fraudulent activities, including financial and medical fraud and identity theft. Indeed, a driving purpose of these types of data breaches is to obtain and misuse victims' Sensitive Information or to make it available on the dark web for misuse. Information such as the Sensitive Information accessed during the Data Breach may also be used to fraudulently obtain medical services, or to perform additionally targeted phishing or hacking attacks directed at the victims of the Data Breach. Consequently, all impacted individuals are at a heightened and substantial risk that their information will be disclosed to criminals and misused for attempted or actual fraud or identity theft.

9. Plaintiff Botteon was a patient at one of AAD's facilities and was impacted by the Data Breach. Since the Data Breach, Plaintiff has uncovered evidence of identity theft and financial fraud through his credit monitoring efforts. Around the same time, Plaintiff noticed attempts to access his financial accounts. Plaintiff remains at a continued risk of harm due to the exposure and potential misuse of his personal data by criminal hackers.

[4] https://www.hipaajournal.com/anne-arundel-dermatology-data-breach/; https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf

10. As such, Plaintiff brings this Complaint on behalf of persons whose Sensitive Information was stolen during the Data Breach.

## JURISDICTION

11. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Here, at least one plaintiff class member will be diverse from Defendant because the class includes patients from Florida, Georgia, Pennsylvania, Tennessee, and North Carolina,

12. This Court has general personal jurisdiction over AAD because it is incorporated in Maryland.

13. This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and because Defendant conducts a substantial part of their business and are headquartered within this District.

## PARTIES

14. **Plaintiff** Troy Botteon is a citizen of Middle River, MD and a patient of AAD. AAD obtained and maintained the Sensitive Information of Plaintiff and owed him a legal duty and obligation to protect and secure that Sensitive Information from unauthorized access or disclosure.

15. Plaintiff Botteon received notice of the Data Breach from AAD via email on July 14, 2025. Plaintiff Botteon suffered actual injury from having his Sensitive Information exposed as a result of the Data Breach, including: (a) time and effort monitoring his accounts for fraudulent

charges and to mitigate the risk of harm from the Data Breach; (b) entrusting Sensitive Information to AAD that he would not have had AAD disclosed that it lacked data security practices adequate to safeguard its patients; (c) damages to and diminution in the value of his Sensitive Information—a form of intangible property that he entrusted to AAD as a condition of receiving healthcare services; (d) loss of his privacy; and (e) continuous imminent an impending injury arising from the increased risk of financial, medical, and identity fraud and theft.

16. **Defendant AAD Dermatology P.A.** is a Maryland corporation with its headquarters and principal place of business at 1306 Concourse Drive, Suite 201, Linthicum Heights, Maryland, 21090.

## FACTUAL ALLEGATIONS

### A. AAD Collects Sensitive Information from Users.

17. AAD is a large and experienced healthcare service provider with more than forty years of experience and locations ranging across seven states.

18. As a regular part of the services that it provides to patients, AAD maintains patients' highly sensitive personal information. Indeed, to obtain services from AAD, patients, like Plaintiff and the Class, must provide their medical providers with highly sensitive information, including PII, PHI, or both. As a massive healthcare service provider, AAD has collected and maintained an enormous depository of Sensitive Information of millions of patients, which acts as a particularly lucrative, and foreseeable, target for data thieves looking to obtain and misuse or sell patient data.

19. Upon information and belief, through its own privacy policy and through its health care providers, AAD represented to Plaintiff and the Class that their Sensitive Information would be kept confidential and not disclosed to unauthorized third parties.

20. Plaintiff and the Class had a reasonable expectation that AAD would protect the Sensitive Information that it collected and maintained, especially because, given the publicity of other data breaches and the significant impact they had, AAD knew or should have known that failing to adequately protect their information could cause substantial harm.

21. AAD's privacy policies acknowledge that it is "legally required to protect the privacy of your health information."[5] It also acknowledges the power of PHI, stating "PHI is information that can be used to identify you, which has been created or received about your past, present, or future health or condition, the provision of healthcare to you, or the payment for this health care."[6]

22. As described throughout this Complaint, AAD did not reasonably protect, secure, or store Plaintiff's and the Class's Sensitive Information prior to, during, or after the Data Breach, but rather enacted unreasonable data security measures that it knew or should have known were insufficient to reasonably protect the highly sensitive information AAD maintained. Consequently, cybercriminals circumvented AAD's security measures, resulting in a significant data breach.

**B. AAD's Inadequate Data Security Measures Exposed Patients' Sensitive Data**

23. On or before February 14, 2025, malicious actors gained unauthorized access to AAD's systems. The malicious actors continued to access the systems for three months, until May 13, 2025. According to AAD, "Anne Arundel Dermatology ("AAD") recently identified an intrusion on certain of its systems by an unauthorized third party. We took immediate action to review this incident and secure our systems. Our review determined that certain data files were accessible to the unauthorized third party for a period of time. We subsequently performed an

[5] https://aadermatology.com/hipaa-privacy-notice/
[6] *Id.*

assessment of these data files and determined, on May 20, 2025, that some of the files contained certain personal or health information when the unauthorized third party had access to them."

24. The information in these files included Sensitive Information like "date of birth, patient ID, medical record number, health history, financial information, insurance information, and appointment history."

25. The hackers' access to this Sensitive Information was made possible by, and caused by, AAD's failure to use reasonable security procedures and practices, especially given the sensitivity of the information that it was maintaining.

26. AAD has attempted to downplay the severity of the three months long intrusion into its systems, stating informing its patients that AAD does not "know whether the third party actually viewed or exfiltrated your information" and that it is unaware of "any misuse of or fraudulent activity relating to anyone's personal or health information as a result of this incident."

27. Although AAD's failure to monitor and lack of vigilance caused the Data Breach, it now states that it is emailing patients to "encourage" patients "to take steps to monitor [their] information" and to "remain vigilant."

**C. AAD Knew It Needed to Protect Users' Sensitive Data**

28. As a healthcare service provider, AAD knew, or should have known, that it needed to implement measures to adequately protect sensitive data.

29. AAD has received ample warning of the need to protect sensitive data.

30. For example, the FTC has issued numerous guidelines for businesses highlighting the importance of reasonable data security practices. The FTC notes the need to factor data security

into all business decision-making.[7] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on networks to uncover unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[8]

31. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

32. As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ⁋ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ⁋ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require

---

[7] Federal Trade Comm'n, *Start with Security A Guide For Business, Lessons Learned from FTC Cases* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[8] *Id.*; Federal Trade Comm'n, *Protecting Personal Information, A Guide For Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded AAD's Data Breach, further clarify the measures businesses must take to meet their data security obligations.

33. AAD was especially on notice of the need to safeguard data because of the history of data breaches in the healthcare industry, which is particularly susceptible to cyberattacks.

34. According to a report from the Identity Theft Resource Center, in the first half of 2025 there were 1,732 publicly reported data breaches, including 283 healthcare data breaches.[9]

35. As a healthcare service provider ranging across seven states and serving millions of patients, AAD knew or should have known the importance of protecting the Sensitive Information entrusted to it. AAD also knew or should have known of the foreseeable and catastrophic consequences if its systems were breached. Despite this, AAD failed to take reasonable data security measures to prevent or mitigate losses from cyberattacks.

36. AAD could have minimized or altogether prevented the Data Breach by taking reasonable steps to properly secure and encrypt the Sensitive Information of Plaintiff and the Class

[9] Identity Theft Resource Center, *Identity Theft Resource Center Sees Acceleration of 2024 Data Breach Trends in First Half of 2025*, (July 16, 2025) https://www.idtheftcenter.org/post/h1-2025-data-breach-report-data-breach-trend-continues/ (last visited July 25, 2025).

and by maintaining a reasonable information retention policy to delete unnecessary patient information.

37. Given the duration and the means by which it occurred, the Data Breach could only have happened with significant and highly concerning data security deficiencies that AAD knew or should have known created a significant risk of harm to millions of individuals.

38. In all, Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

- Failing to maintain an adequate data-security system to reduce the risk of data breaches and cyberattacks
- Failing to meet the standards established by its data-security and privacy policies
- Failing to adequately protect PII and PHI entrusted to it
- Failing to properly monitor its own data security systems for existing intrusions
- Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures
- Failing to train its employees in the proper handling of emails containing PII and maintain adequate email security practices
- Failing to adhere to industry standards for cybersecurity.

39. Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Sensitive Information by allowing cyberthieves to access Defendant's computer network and systems which contained unsecured and unencrypted Sensitive Information.

**D. AAD's Data Breach Harmed Plaintiff and the Class**

40. Plaintiff's and the Class's data exposed in the Data Breach constitute the type of data specifically targeted by and valuable to hackers.

41. Indeed, hackers increasingly sell these sensitive records on the black market to purchasers who seek to use the personally identifying information to create fake IDs, make

fraudulent transactions, obtain loans, or commit other acts of identity theft.[10]

42. The risk of identity theft after a data breach is lasting. The U.S. Government Accountability Office's research into the effects of data breaches found that "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web—as is the case in this Data Breach—fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot rule out the significant risk of future harm."[11]

**E. Plaintiff's Experience**

43. As a condition of receiving health care, Plaintiff Botteon provided AAD with his highly personal information, including PII and PHI as described in the foregoing paragraphs. AAD maintained access to and control over this Sensitive Information. Plaintiff Botteon expected that his Sensitive Information would remain safeguarded and would not be accessible by unauthorized third parties.

44. However, on July 14, 2025, Plaintiff Botteon received notice from AAD that AAD's servers had been breached.

45. Subsequent to and as a direct result of the Data Breach, Plaintiff Botteon has been notified of attempts to access his private online accounts. Specifically, subsequent to the data breach was notified that someone was trying to access his Cash App, a financial services platform. Additionally, an unauthorized individual did in fact access his Microsoft account.

---

[10] *How do hackers make money from your stolen data?*, Emsisoft.com (Feb. 20, 2020), https://blog.emsisoft.com/en/35541/how-do-hackers-make-money-from-your-stolen-data/

[11] Report to Congressional Requesters, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown 29 (Jun. 2007), http://www.gao.gov/new.items/d07737.pdf (last accessed Nov. 30, 2018).

46. Also subsequent to and as a direct and proximate result of the Data Breach, Plaintiff Botteon has uncovered two fraudulent addresses and names on his Credit Karma account. Plaintiff Botteon has diligently monitored his credit for years, and prior to the Data Breach had never uncovered any fraudulent activity on his report. Plaintiff now finds it necessary to closely monitor his credit reports to counter the fraudulent activity occurring due to the Data Breach.

47. Plaintiff Botteon is very careful about sharing and protecting Sensitive Information. Plaintiff has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured channel.

48. Plaintiff Botteon suffered actual injury from having his sensitive information exposed and/or stolen as a result of the Data Breach, including but not limited to: (a) mitigation efforts, including monitoring of Plaintiff's credit and account and other efforts to ensure that his information is not being used for financial, medical, and identity theft or fraud, and time and expense thereof; (b) damages to and diminution of the value of his Sensitive Information, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; (c) loss of privacy; and (d) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft.

49. In addition, knowing that hackers accessed his Sensitive Information and that this likely has been and/or will be used in the future for financial, medical, and identity theft has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

50. Despite AAD's failure to reasonably protect Plaintiff's and the Class's Sensitive Information, it has not offered any compensation or adequate remedy, especially considering the significant and long-term risk Plaintiff and the Class face.

## CLASS ALLEGATIONS

51. Plaintiff brings this action on behalf of himself and all other persons similarly situated pursuant to Fed. R. Civ. P. 23 and seeks certification of the following Nationwide Class:

All individuals that received or were otherwise sent notice that their data was potentially compromised due to AAD's Data Breach.

52. Excluded from the class is AAD and its subsidiaries and affiliates; all employees of AAD; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

53. Plaintiff reserves the right to, after conducting discovery, modify, expand or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

54. **Numerosity**. Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff believes that there are over one million members of the Class. The number of reportedly impacted individuals already exceeds 1.9 million. The precise number of class members, however, is unknown to Plaintiff. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

55. **Commonality and Predominance**. Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members. These common questions include, without limitation:

a. Whether AAD knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

b. Whether AAD controlled and took responsibility for protecting Plaintiff's and the Class's data when solicited that data, collected it, and stored it on its servers;

c. Whether AAD's security measures were reasonable in light of the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

d. Whether AAD owed Plaintiff and the Class a duty to implement reasonable security measures;

e. Whether AAD's failure to adequately secure Plaintiff's and the Class's data constitutes a breach of its duty to institute reasonable security measures;

f. Whether AAD's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiff's and the Class's data;

g. Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

h. Whether Plaintiff and the Class were injured and suffered damages or other losses because of AAD's failure to reasonably protect its data systems; and

i. Whether Plaintiff and the Class are entitled to relief.

56. **Typicality**. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical member of the Class. Plaintiff and the Class are each persons who provided data to AAD, whose data resided on AAD's servers, and whose Sensitive Information was exposed in AAD's Data Breach. Plaintiff's injuries are similar to other class members and Plaintiff seeks relief consistent with the relief due to the Class.

57. **Adequacy**. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against AAD to obtain relief for himself and for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

58. **Superiority**. Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

59. **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), AAD, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## LEGAL CLAIMS

### COUNT I
### Negligence

60. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

61. AAD owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the sensitive data it solicited from Plaintiff and the Class and managed and stored. This duty arises from multiple sources.

62. AAD owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target AAD's data systems and servers containing Plaintiff's and the Class's sensitive data and that, should a breach occur, Plaintiff and the Class would be harmed. AAD alone controlled its technology, infrastructure, and

cybersecurity. It further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and the Class. Furthermore, AAD knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of AAD's unsecured, unreasonable data security measures.

63. Additionally, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, required AAD to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of AAD's duty to Plaintiff and the Class. Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like AAD of failing to use reasonable measures to protect sensitive data. AAD, therefore, was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of AAD's duty to adequately protect sensitive information. By failing to implement reasonable data security measures, AAD acted in violation of § 5 of the FTCA.

64. AAD is obligated to perform its business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring AAD to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class.

65. Finally, AAD assumed the duty to protect patients' sensitive data by soliciting, collecting, and storing users' data and, additionally, by representing to patients that it would keep their data safe.

66. AAD breached its duty to Plaintiff and the Class by implementing unreasonable data security measures that it knew or should have known could cause a Data Breach. AAD knew or should have known that hackers might target sensitive data that AAD solicited and collected on its users and, therefore, needed to use reasonable data security measures to protect against a Data Breach.

67. AAD was fully capable of preventing the Data Breach. AAD, as a healthcare provider, knew or should have known of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited and shortened the scope of the Data Breach. AAD thus failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

68. As a direct and proximate result of AAD's negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

**COUNT II**
**Negligence *Per Se***

69. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

70. AAD's unreasonable data security measures and failure to timely notify Plaintiff and the Class of the Data Breach violates Section 5 of the FTC Act. Although the FTC Act does not create a private right of action, both require businesses to institute reasonable data security measures and breach notification procedures, which AAD failed to do.

71. Section 5 of the FTCA, 15 U.S.C. §45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by

businesses like AAD of failing to use reasonable measures to protect users' sensitive data. The FTC publications and orders described above also form the basis of AAD's duty.

72. AAD violated Section 5 of the FTC Act by failing to use reasonable measures to protect users' personally identifying information and sensitive data and by not complying with applicable industry standards. AAD's conduct was particularly unreasonable given the sensitive nature and amount of data it stored on its users and the foreseeable consequences of a Data Breach should AAD fail to secure its systems.

73. AAD's violation of Section 5 of the FTC Act constitutes negligence *per se*.

74. Plaintiff and the Class are within the class of persons Section 5 of the FTCA (and similar state statutes) was intended to protect. Additionally, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same type of harm suffered by Plaintiff and the Class.

75. As a direct and proximate result of AAD's negligence per se, Plaintiff and the Class have suffered and continue to suffer injury.

**COUNT III**
**Declaratory and Injunctive Relief**

76. Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

77. Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

78. An actual controversy has arisen in the wake of the Data Breach at issue regarding AAD's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiff alleges AAD's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

79. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. AAD owed, and continues to owe a legal duty to secure the sensitive information with which it is entrusted, specifically including patients' personal and health information, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

b. AAD breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and

c. AAD's breach of its legal duty continues to cause harm to Plaintiff and the Class.

80. The Court should also issue corresponding injunctive relief requiring AAD to employ adequate security protocols consistent with industry standards to protect its users' (*i.e.* Plaintiff's and the Class's) data.

81. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of AAD's data systems. If another breach of AAD's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced

to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

82. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to AAD if an injunction is issued.

83. Issuance of the requested injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

**PRAYER FOR RELIEF**

84. Wherefore, Plaintiff, on behalf of himself and the Class, requests that this Court award relief as follows:

a. An order certifying the class and designating Plaintiff as the Class Representative and their counsel as Class Counsel;

b. An award to Plaintiff and the proposed Class members of damages with pre-judgment and post-judgment interest;

c. A declaratory judgment in favor of Plaintiff and the Class;

d. Injunctive relief to Plaintiff and the Class;

e. An award of attorneys' fees and costs as allowed by law; and

f. An award such other and further relief as the Court may deem necessary or appropriate.

**JURY TRIAL DEMANDED**

85. Plaintiff hereby demands a jury trial for all the claims so triable.

Respectfully submitted,

Dated: July 29, 2025

/s/ ______________________

Steven D. Silverman (# 22887)
ssilverman@silvermanthompson.com
Andrew G. Slutkin (# 09445)
aslutkin@silvermanthompson.com
William N. Sinclair (# 28833)
bsinclair@silvermanthompson.com
Silverman Thompson Slutkin & White, LLC
400 E. Pratt St., Suite 900
Baltimore, MD 21202
(410) 385-2225 (t)
(410) 547-2432 (f)

Brian C. Gudmundson (*pro hac vice forthcoming*)
Michael J. Laird (*pro hac vice forthcoming*)
Madison M. DeMaris (*pro hac vice forthcoming)*
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
madison.demaris@zimmreed.com

*Counsel for Plaintiff*